UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JOHN BUCCIERI | ) ) ) ) | |
| v. | ) ) ) | Civ. No. 4:22-cv-11939-MRG |
| BREWSTER AMBULANCE SERVICE, INC. | ) ) ) ) | |

### ORDER ON DEFENDANT'S RULE 50(b) MOTION [ECF No. 98]

**GUZMAN, J.**

Plaintiff John Buccieri sued Defendant Brewster Ambulance Service, Inc. ("Brewster") for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 1211 *et seq.*, alleging Brewster failed to hire him for a Chair Car Driver ("CC Driver") position because he is deaf. On February 10, 2025, a five-day jury trial commenced. Trial was bifurcated into two phases: liability and damages. At the liability phase of the trial, Plaintiff proceeded on two theories to establish his failure to hire ADA claim: Legal Theory 1: failure to provide a reasonable accommodation, and Legal Theory 2: failure to engage in the interactive process. The jury was instructed as to both theories. The jury returned its verdict for liability on the fifth day of trial, granting Plaintiff a victory on Theory 2, but finding the Defendant had established an affirmative defense on Theory 1. [Verdict Form, ECF No. 73]. For various reasons, including that Plaintiffs' counsel had an emergency family situation that made him unavailable, the Court continued the damages phase of the trial to a later date.

Following the verdict, the Court had its own concerns regarding the legal basis for Plaintiff's interactive process theory and ordered supplemental briefing on the sufficiency of the

evidence for Legal Theory 2. [ECF No. 97]. Brewster used this opportunity to bring a motion for judgment as a matter of law under Rule 50(b), [ECF No. 98], which, if granted, would vacate the jury's verdict on liability. After a review of the parties' briefings, the evidence at trial, the jury instructions, verdict form, and case law, the Court finds that there was an error in the verdict form that necessitates relief under Rule 50(b). For the reasons stated below, the Court **GRANTS** Brewster's Rule 50(b) motion.

I.  **BACKGROUND**

The Court draws from the parties' filings, [ECF Nos. 98 & 99] to summarize the facts of the case.[1]

A. **Evidence at Trial**

Plaintiff was born deaf. [Trial Tr. Day 1 93:11–12, ECF No. 74]. His first language is American Sign Language ("ASL"). [Trial Tr. Day 1 93:16–23]. To fully understand both verbal and written communications, Plaintiff needs to have them interpreted for him in ASL. [Trial Tr. Day 2 81:3–11]. Plaintiff uses a video relay system ("VRS") to access an ASL interpreter. [Trial Tr. Day 1 94:7–19].

Plaintiff applied for a Chair Car Driver ("CC Driver") position on January 10, 2019. [Ex. 1].[2] The ability to "read, speak, and write English" is a job requirement. [Ex. 3]. Chair Cars are staffed with one driver only and the Drivers transport wheelchair bound patients to medical appointments. [Trial Tr. Day 2 98:16–19, 107:14–108:4, 109:2–16; Trial Tr. Day 3 36:15–18, 60:17–61:2, 67:15–68:11]. CC Drivers communicate with Brewster's dispatch frequently and

---

[1] Trial Transcripts are cited by day and correspond to the docket as follows: Trial Tr. Day 1 (ECF No. 74); Trial Tr. Day 2 (ECF No. 75); Trial Tr. Day 3 (ECF No. 76); Trial Tr. Day 4 (ECF No. 77); Trial Tr. Day 5 (ECF No. 78).

[2] All exhibits are trial exhibits on file with the Clerks' Office.

Brewster's reliable radio system is the preferred means of contacting dispatch. [ Trial Tr. Day 2 93:11–14; Trial Tr. Day 3 12:10–13:9, 14:16–15:4, 39:13–40:9, 64:18–67:14, 68:24–69:25]. Chair Car Drivers monitor patients in the back as they are being transported and communicate with dispatch, patients, and medical facilities frequently. [Trial Tr. Day 3 11:15–13:9]. Patients do have emergencies that require the Driver to respond quickly. [Trial Tr. Day 2 109:17–110:17; Trial Tr. Day 3 35:2–24, 40:24–43:19, 61:23–63:12].

After an initial telephone interview with Plaintiff, Joseph Hughes, Brewster's Regional Manager, scheduled him for an in-person interview on January 24, 2019. [Trial Tr. Day 2 82:19–21; Ex. 2]. Mr. Hughes knew Plaintiff was deaf before he interviewed him. [Trial Tr. Day 2 88:9–11]. Prior to the in-person interview, Mr. Hughes asked Brewster's Human Resources Department about accommodations that could be offered to Plaintiff. [Ex. 2]. Paul Mohnkern, Brewster's Human Resources Manager, identified several issues to discuss with Plaintiff, including how he would deal with the general public, handle an emergency or a difficult patient, and timely communicate with dispatch. [Ex. 2; Trial Tr. Day 3 83:11–13]. Mr. Mohnkern noted that they needed to make sure that Plaintiff, the patient and the vehicle were all safe. [Ex. 2]. Safety concerns were a legitimate issue, as VRS would require Plaintiff to use a cell phone while driving as cell phone use is the number one cause of distracted driving accidents at Brewster. [Trial Tr. Day 3 72:3–12].

In advance of the in-person interview, Mr. Hughes provided Plaintiff with the CC Driver job description and identified the need to communicate by radio with dispatch and with clients as issues to discuss when they met. [Ex. 6]. Mr. Hughes asked Plaintiff to look at the job description and "think of ways we can help you achieve the requirements of the job." [Ex. 5; see also Exs. 2,

3

4 (Brewster employees discussing providing the job description in advance so Plaintiff could be prepared to discuss the job and accommodation during the interview)].

Plaintiff attended his interview with Mr. Hughes with an interpreter. [Trial Tr. Day 1 108:6–9]. After the interview, Mr. Hughes reported that Plaintiff was an "excellent" candidate and described how VRS ("a phone number we call and a ASL interpreter responds in realtime" using a cell phone) could be used to communicate with dispatch. [Trial Tr. Day 2 68:18–24; Ex. 6]. Use of VRS was the only accommodation Plaintiff requested. [Trial Tr. Day 3 15:5–12]. VRS was never suggested as a means to communicate with patients. [Trial Tr. Day 3 150:4–13]. Mr. Hughes also suggested that Brewster have an ASL interpreter available for Plaintiff's training and first day. [Ex. 6].

Mr. Mohnkern informed Brewster's owners, Mark Brewster and George Brewster, Jr., and their father, George Brewster, Sr., about Plaintiff and the requested accommodation. The Brewsters, collectively, have over 100 years of experience in the ambulance industry. [Trial Tr. Day 3 58:23–59:3]. Mark worked as a CC Driver for four years. [Trial Tr. Day 3 64:14–17]. Mark expressed concern that Plaintiff would not be able to communicate with staff and dispatch even using the VRS system, but was "open to hearing other information about how he could do the job." [Trial Tr. Day 3 75:19–77:19]. George, Sr. commented that it would be "awesome" to hire Plaintiff but also expressed concerns with Plaintiff's ability to communicate with facility staff, identify whether a patient needed help, and communicate with patients. [Ex. 8]. George, Sr. noted that hiring Plaintiff, if he could do the job, "would make the company look good[.]" [Ex. 9.4].

On January 31, 2019, Plaintiff did a "ride along" in a Chair Car with a supervisor at Brewster. [Trial Tr. Day 1 110:2–5; Ex. 10]. Plaintiff did not have an interpreter with him for the actual "ride along." [Trial Tr. Day 1 110:2–11]. The Court pauses here to note there was a dispute

at trial as to the identity of the supervisor that conducted the ride along with Plaintiff. Mr. Hughes testified he believed William Sefton, a Chair Car Supervisor, conducted the ride-along and provided negative feedback on Mr. Buccieri's communication abilities. [Trial Tr. Day 2, 95:8–14 (Hughes identifying Sefton as the likely supervisor); Ex. 10 (Hughes' email Feb. 1, 2019, relaying supervisor's concerns); Trial Tr. Day 3, 26:21–27:9 (Hughes stating ride-along feedback caused him to "rethink" but not change his ultimate view of Buccieri's capability)]. However, when testifying, Mr. Sefton unequivocally denied conducting a ride-along with Mr. Buccieri and denied evaluating any deaf applicant. [Trial Tr. Day 3, 33:16–22 (Sefton denying conducting ride-along or recognizing Buccieri); Trial Tr. Day 3, 34:6–11 (Sefton denying evaluating a deaf applicant and stating he had never done a ride-along with a non-employee)]. It is also disputed as to the extent to which VRS was tested during the ride along. Mr. Buccieri testified that he didn't use his phone during the ride along. [Trial Tr. Day 1, 115:2–4]; while Mr. Mohnkern could not confirm whether VRS was used, noting he did not have information as to what accommodations were tested during the ride along.

After the ride along, Mr. Hughes reported the feedback from the unidentified supervisor in an email on February 1, 2019:

> He rode yesterday with our CC supervisor for 3 calls. Our supervisor is concerned he will not be able to do the job and expresses concerns on his ability to communicate with the clients and staff at the facility. As much as I would like to hire him as he is very dedicated to this I also share the same concerns. Can we offer him anything else in our organization?

[Ex. 10]. Mr. Mohnkern asked if driving the Day Care van was an option, but the concern about being able to communicate with the patients was the same for that position. [Ex. 10]. Mr. Mohnkern shared this information with Mark, who responded: "As much as I would like to give him an opportunity Joes email says it all. If he can't communicate with the patients I don't see

how it would work." Mr. Mohnkern also looked at whether there were any other open positions. [Ex. 10]. These conversations occurred internally at Brewster and Mr. Buccieri was not contacted to discuss Brewster's concerns.

On February 14, 2019, someone from Brewster called Mr. Buccieri to tell him that the company would not be hiring him for the CC Driver position. [Trial Tr. Day 3 115:7–8]. There was evidence that Mr. Buccieri had been told he would be provided with a rationale for the rejection in a follow-up email. [Trial Tr. Day 3 116:9–19]. On February 24, Mr. Mohnkern emailed Jennifer L Courville, the Career Resource Specialist at Work Opportunities Unlimited who had been assisting Plaintiff in his job search. [Exs. 11-13]. Mr. Mohnkern informed Ms. Courville that a decision had been made not to hire Plaintiff and outlined, in great detail, the concerns that Brewster had with Plaintiff's ability to perform the CC Driver role with the VRS accommodation requested. [Ex. 13]. The concerns about VRS included delays that result when using the system. On cross-examination, Plaintiff conceded that the VRS was "really not a professional process," "wasn't clear," and had connection and "technical" issues. [Trial Tr. Day 2 69:10–75:7]. In his email to Ms. Courville, Mr. Mohnkern invited questions. Mr. Mohnkern testified that Brewster was open to further discussion on accommodations. [Trial Tr. Day 3 134:8–10]. Neither Ms. Courville nor Plaintiff ever responded to Mr. Mohnkern's email. [Trial Tr. Day 2 80:6–24].

### B. **Affirmative Defenses**

Brewster raised two affirmative defenses: undue hardship and direct threat. The jury was instructed as follows:

> If Mr. Buccieri meets his burden of proving all of the necessary elements of his failure-to-hire claim against Brewster Ambulance, you must nevertheless find for the Defendant on that claim if you determine that Brewster Ambulance has established, by a preponderance of the evidence, that providing the accommodation would have imposed either an undue burden or posed a direct threat to Mr. Buccieri or others.

> An "undue hardship" is an action that would create significant difficulty or expense for Brewster Ambulance, considering the nature and cost of the accommodation, the overall financial resources of Brewster Ambulance, the effect of the accommodation on expenses and resources, and the impact of the accommodation on the operations of Brewster Ambulance, including the impact on the ability of other employees to perform their duties and the impact on Brewster Ambulance's ability to conduct business.
>
> "Direct threat" means a significant risk of substantial harm to the health or safety of the employee or others that cannot be eliminated or reduced by reasonable accommodation.

[Trial Tr. Day 4 81:15–82:10].

Throughout the trial, the jury heard testimony regarding Brewster's affirmative defenses to providing the reasonable accommodation Mr. Buccieri requested, the VRS technology. For example, Mark Brewster testified that utilizing a cell phone, as is required for VRS, could pose the safety risk of distracted driving, which is the number one cause of vehicle accidents at Brewster. [Trial Tr. Day 3 64:18–66:13, 72:3–12]. Brewster was concerned about Mr. Buccieri's inability to use the radio communication system and also about his ability to communicate with staff at patient facilities. [Trial Tr. Day 3 75:19–76:1]. There was testimony about potential medical emergencies where a CC Driver's ability to hear and respond immediately would be critical, such as if a patient were vomiting or choking, or if a patient slipped out of their wheelchair or became unbuckled while the car was moving. [Trial Tr. Day 3 62:19–63:9; Trial Tr. Day 2 109:17–110:18; Trial Tr. Day 3 40:24–41:6, 41:20–42:13]. Mark Brewster also testified that Chair Cars are usually staffed with only one employee, and, despite this lean staffing, the service operates at a financial loss due to low reimbursement rates from insurance. [Trial Tr. Day 3 67:15–68:5 (noting the MassHealth reimbursement rate in 2019 was $20 per wheelchair van ride)].

### C. Rule 50 Motions, Verdict Form, and Verdict

At the close of Plaintiff's case, defense counsel made a 50(a) motion for directed verdict. [Trial Tr. Day 3 145:5–155:20]. As grounds, counsel argued that the evidence did not support that Mr. Buccieri could perform the essential elements of the job, that Brewster had shown that accommodating Mr. Buccieri would be an undue hardship, and that there could be no separate claim for failing to engage in the interactive process on the facts presented. [Trial Tr. Day 3 145:5–155:20]. At the charge conference, defense counsel also objected to the phrasing of Question 6 on the verdict form, which read, "Did the Plaintiff, Mr. John Buccieri, prove by a preponderance of the evidence that, had a good faith interactive process occurred, Mr. Buccieri and Brewster Ambulance could have found reasonable accommodation(s) that would have enabled Mr. Buccieri to perform the job's essential functions?" [Verdict Form, Question 6]. Counsel objected because she believed the phrase, "had a good faith interactive process occurred," assumed that a good faith process did not occur – which was the core question the jury was charged with determining. [Trial Tr. Day 4 10:22–12:11]. The Court overruled the objection in the moment and Question 6 was sent to the jury unchanged.

On Legal Theory 1, the jury ruled that Plaintiff had established his prima facie case on his reasonable accommodation theory but ruled for the Defendant on its affirmative defense. The verdict form included a special interrogatory as whether Brewster met its burden on proving that providing Mr. Buccieri with his requested accommodation(s) would have been an undue hardship to the company or a direct threat to others. [Verdict Form, Question 4]. The jury answered in the affirmative, thus relieving Brewster of liability on the reasonable accommodation theory.

The jury was next asked to consider Plaintiff's second legal theory: failure to engage in an interactive process. The verdict form first asked whether Mr. Buccieri made a sufficiently direct and specific request for an accommodation so as to put Brewster on notice of the need for that

8

accommodation. The jury answered, "Yes." [Verdict Form, Question 5]. Next, the verdict form asked the contested question, "Did the Plaintiff, Mr. John Buccieri, prove by a preponderance of the evidence that, had a good faith interactive process occurred, Mr. Buccieri and Brewster Ambulance could have found reasonable accommodation(s) that would have enabled Mr. Buccieri to perform the job's essential functions?" [Verdict Form, Question 6]. After deliberations, the jury answered Question 6 in the affirmative, meaning Plaintiff lost on Legal Theory 1 (reasonable accommodation), but won on Legal Theory 2 (interactive process). After the verdict was announced, defense counsel renewed her motion for judgment as a matter of law.

## II. **LEGAL STANDARDS**

Under Rule 50(b), a district court may grant judgment as a matter of law after a trial if the record reveals no evidentiary basis for the verdict. C.P. Packaging, Inc. v. Hall, No. 20-12041-FDS, 2023 U.S. Dist. LEXIS 188865, at *8 (D. Mass. Oct. 20, 2023); Fed. R. Civ. P. 50(b). A party must first file a Rule 50(a) motion[3] as a prerequisite to a Rule 50(b) motion[4] and must advance the same legal theories in both motions. Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 8 (1st Cir. 2021) ("A Rule 50(b) motion cannot be used to introduce a legal theory not distinctly articulated in the Rule 50(a) motion." (internal quotation marks and citation omitted)). A district court may only grant a Rule 50(b) motion only when "the evidence, together with all reasonable

---

[3] A Rule 50(a) motion for "judgment as a matter of law" used to be referred to as a "directed verdict" prior to the 1991 amendment to the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment; Santos-Arrieta v. Hosp. Del Maestro, 14 F.4th 1, 9 n.14 (1st Cir. 2021).

[4] "'JNOV' (short for judgment non obstante veredicto) refers to a judgment notwithstanding the verdict, JNOV, Black's Law Dictionary (11th ed. 2019), which was yet another pre-1991 term, this time for a modern-day Rule 50(b) motion." Santos-Arrieta, 14 F.4th at 9 n.15; Fed. R. Civ. P. 50 advisory committee's note to 1991 amendment.

inferences in favor of the verdict, could lead a reasonable person to only one conclusion, namely, that the moving party was entitled to judgment. PH Grp., Ltd. v. Birch, 985 F.2d 649, 653 (1st Cir. 1993) (quoting Luson Int'l Distribs., Inc. v. Fabricating and Prod. Mach., Inc., 966 F.2d 9, 10–11 (1st Cir. 1992)).  The Court's review of the record is "'weighted toward preservation of the jury verdict' because a verdict should be set aside only if the jury failed to reach the only result permitted by the evidence." Quiles-Quiles v. Henderson, 439 F.3d 1, 4 (1st Cir. 2006) (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393 (1st Cir. 2002)).

### III.   DISCUSSION

Brewster is entitled to judgment as a matter of law because the jury's verdict that Brewster failed to engage in an interactive process is inconsistent with the jury's verdict that Brewster met its burden on its affirmative defense that providing Mr. Buccieri with a reasonable accommodation posed an undue hardship or direct threat to others.

First Circuit case law is unsettled as to a plaintiff's entitlement to an interactive process. The interactive process has been framed as part of the elements of a reasonable accommodation theory, with the First Circuit noting, "an employee's request for accommodation *sometimes* creates 'a duty on the part of the employer to engage in an interactive process.'" EEOC v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014) (quoting Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008)) (emphasis added). While the First Circuit in Kohl's declined to address the circumstances under which an employer might have a duty to engage in an interactive process, it unequivocally stated, "[t]his court does not regard an employer's participation in the interactive process as an absolute requirement under the ADA. Instead, we have held that we 'resolve the issue on a case-by-case basis.'" Kohl's, 774 F.3d at 132 n.5 (quoting Kvorjak v. Maine, 259 F.3d 48, 52 (1st Cir. 2001)). Additionally, the First Circuit has noted "the scope of the employer's

obligation in this [interactive] process is not crystal clear." Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 109 (1st Cir. 2005) (alterations in original) (quoting Calero-Cerezo v. Dep't of Justice, 355 F.3d 6, 23–24 (1st Cir. 2004)).

Despite this lack of clarity on when an interactive process claim might arise, the First Circuit has laid out some basic tenets of such a claim. "The interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues." Kohl's, 774 F.3d at 132 (citing 29 C.F.R. § 1630.2(o)(3)). While the process "varies depending on the circumstances of each case," it "nevertheless requires both the employer and employee to engage in a meaningful dialogue, in good faith, for the purpose of discussing alternative reasonable accommodations." Ortiz-Martinez v. Fresenius Health, P.R., LLC, 853 F.3d 599, 605 (1st Cir. 2017) (citing Kohl's, 774 F.3d at 132). Claims arise when there is no process at all or there is a breakdown in the process. See id. "Once a breakdown in the process has been identified, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." Ortiz-Martinez, 853 F.3d at 605 (internal quotation marks and citations omitted). The process "requires bilateral cooperation and communication." Kohl's, 774 F.3d at 132 (citing Enica, 544 F.3d at 339). "If an 'employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations.'" Ortiz-Martinez, 853 F.3d at 605 (quoting Enica, 544 F.3d at 339).

The haziness surrounding the interactive process in the First Circuit is in stark contrast to the Ninth Circuit, where an employee seeking a reasonable accommodation is entitled to an interactive process once they notify their employer of their need: "notifying an employer of a need

11

for an accommodation triggers a duty to engage in an 'interactive process' through which the employer and employee can come to understand the employee's abilities and limitations, the employer's needs for various positions, and a possible middle ground for accommodating the employee." Snapp v. United Transp. Union, 889 F.3d 1088, 1095 (9th Cir. 2018) (citing Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1111–16 (9th Cir. 2000) (en banc), vacated on other grounds sub nom., US Airways, Inc. v. Barnett, 535 U.S. 391, 406 (2002)). "In Barnett, the Ninth Circuit held that if an employer receives notice and fails to engage in the interactive process in good faith, the employer will face liability '*if a reasonable accommodation would have been possible*.'" Id. (emphasis in original) (quoting Barnett, 228 F.3d at 1116). Therefore, "there exists no stand-alone claim for failing to engage in the interactive process. Rather, discrimination results from denying an available and reasonable accommodation." Snapp, 889 F.3d at 1095.

Importantly, in the Ninth Circuit, failure to engage in an interactive process only leads to liability when a reasonable accommodation would have been possible. Snapp, 889 F.3d at 1095. In evaluating an employer's failure to engage in an interactive process at summary judgment in the Ninth Circuit, the burden "shifts to the employer to prove the unavailability of a reasonable accommodation." Id. (citation omitted). This makes good sense, even in the First Circuit. If the purpose of the interactive process is to find a reasonable accommodation for the employee, see Ortiz-Martinez, 853 F.3d at 605 (citing Kohl's, 774 F.3d at 132), then surely an employer should not be held liable when no reasonable accommodation is available. Therein lies the problem with the jury's verdict in this case.

The jury's verdict on Legal Theory 1, finding Brewster not liable because providing a reasonable accommodation was an undue burden or direct threat to others, is inconsistent with its verdict on Legal Theory 2 because a defendant should be relieved from liability for failing to

12

engage in an interactive process when it proves that a reasonable accommodation was not feasible. While the First Circuit "[is] reluctant to talk about the problem of the relationship between 'reasonable accommodation' and 'undue hardship' as one of shifting burdens[,]" Reed v. Lepage Bakeries, Inc., 244 F.3d 254, 258-59 (1st Cir. 2001), the Appeals Court recognizes that an employer should not be held liable for providing something that is not feasible to attain; that is the basis of the undue hardship affirmative defense on a reasonable accommodation claim. See id. at 259.[5] The First Circuit has held similarly regarding the interactive process, albeit implicitly, noting "liability for failure to engage in an interactive process 'depends on a finding that, had a good faith interactive process occurred, *the parties could have found a reasonable accommodation* that would enable the disabled person to perform the job's essential functions.'" Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 91 (1st Cir. 2012) (emphasis added) (quoting Kvorjak v. Maine, 259 F.3d 48, 52 (1st Cir. 2001)).  The italicized language quoted above makes clear that baked into a successful interactive process claim is the assumption that liability can only be established when a reasonable accommodation could have been found.

Here, the jury unequivocally found that Brewster had proven "by a preponderance of the evidence that providing Mr. Buccieri with the requested accommodation(s) would have been an undue hardship to Brewster Ambulance and/or posed a direct threat to Mr. Buccieri or others." [Verdict Form, Question 4]. Therefore, any interactive process would not have been fruitful, and Brewster cannot be liable for disengaging in the interactive process when it concluded it could not provide Mr. Buccieri a reasonable accommodation. There was ample evidence at trial that

---

[5] (discussing the relationship between plaintiff's burden for establishing a "reasonable accommodation" and defendant's burden on establishing "undue hardship," noting, "[i]f plaintiff succeeds in carrying this burden, the defendant then has the opportunity to show that the proposed accommodation is not as feasible as it appears but rather that there are further costs to be considered, certain devils in the details.").

established Brewster's undue hardship. See Section I.B, supra. The Court does not need to recharacterize the evidence, weigh credibility, or draw any inferences to conclude that the verdict on Legal Theory 2 should be set aside because "the jury failed to reach the only result permitted by the evidence.'" Quiles-Quiles, 439 F.3d at 4. Question 6 as it appeared on the verdict form presumed that a reasonable accommodation was available when the jury had already determined it was not. This was error. Therefore, Brewster is entitled to judgment as a matter of law. See Fed. R. Civ. P. 50(b).

## IV. CONCLUSION

For the reasons stated above, Defendant's Rule 50(b) motion is **GRANTED**. The jury's verdict on the liability phase is overturned. As the case was scheduled to proceed to a second phase of trial, no judgment has been entered yet on the claims. Accordingly, the Court shall now enter judgment in favor of Defendant Brewster Ambulance on all counts.

**SO ORDERED.**

Dated: July 28, 2025

                                               /s/ Margaret R. Guzman
                                               Margaret R. Guzman
                                               United States District Judge